UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KALIMANTANO GmbH;<br>(a company under the laws of Germany)<br>TOFIK DAVIDOFF;<br>KONSTANTIN FELDE<br>(both German citizens)<br><br>   Plaintiffs<br><br>-against-<br><br>DANIEL HIRSCH<br>(New York resident);<br>WATCHNETWORK.COM<br>(New York unincorporated association);<br>MMI DISTRIBUTION, INC.;<br>GMT DISTRIBUTION, INC.;<br>(both New York corporations);<br>TWITTER, INC.<br>(California corporation with office in New York)<br><br>and DOES from 1 to 100<br><br>   Defendants | CIVIL No. 1:13cv00560-WHP<br><br>**COMPLAINT**<br><br>**FOR DAMAGES, ORDERS AND INJUNCTIVE RELIEF BASED ON:**<br><br>**1. ANTICYBERSQUATTING CONSUMER PROTECTION ACT, 15 USC §1125;**<br>**2. DEFAMATION;**<br>**3. DAMAGE TO BUSINESS REPUTATION;**<br>**4. INVASION OF PRIVACY;**<br>**5. INJUNCTIVE RELIEF** |

## I.  NATURE OF ACTION

This is an action pursuant to the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. §1125(d) and under State law, without limitations.  Plaintiffs seek award of various damages on multiple causes of action, as well as for the orders including for injunctive relief.  The present action is related to another action in this U.S. District Court,  *Kalimantano et al. v. Motion in Time Inc. et al*., Docket 12cv6969, pending in this Court, the U.S. District Court for the Southern District of New York, as described below.

1

## II.  PARTIES.

1.      Plaintiff KALIMANTANO GmbH (hereinafter "KALIMANTANO") is a company registered in the Federal Republic of Germany, with main offices at:  Louisen Strasse 98, 61348, Bad Homburg, Germany.  KALIMANTANO, located in one of the suburbs of Frankfurt am Main (also known as Frankfurt), is in the business of foodstuffs' wholesale and supplies to stores and customers in Germany.   The website of KALIMANTANO could be found at this link: www.kalimantano.de.   That company, founded in 2001, has been in good standing in Germany at all times, with the following registration information: HRB 11537, Amtsgericht Bad Homburg, tax ID 00323705022, Ust - Id Nr. DE 813474195.   KALIMANTANO became the subject to the defamation campaign on the Internet, facilitated by Defendants herein, acting in concert.

2.      Plaintiff TOFIK DAVIDOFF (hereinafter also "DAVIDOFF") is a German citizen.   DAVIDOFF is a prominent business person and one of KALIMANTANO's operating managers and principals.  His address is: c/o Kalimantano GmbH, Louisen Strasse 98, 61348, Bad Homburg, Germany.  Among facts relevant here, DAVIDOFF paid from KALIMANTANO's account $120,000 to the account of Motion in Time, Inc. ("MIT") at Bank of America, but received no merchandise that he ordered.  DAVIDOFF became the subject of the defamation campaign on the Internet, facilitated by the principals of MIT, facilitated by Defendants herein.

3.      Plaintiff KONSTANTIN FELDE (hereinafter also "FELDE") is a German businessman, one of the operating managers of KALIMANTANO.  His address is: c/o Kalimantano GmbH, Louisen Strasse 98, 61348, Bad Homburg, Germany.  As one of the principals of KALIMANTANO and DAVIDOFF's associate, TOFIK also suffered damages from the defamation campaign on the Internet, facilitated by Defendants herein.

2

4.      Defendant DANIEL HIRSCH (hereinafter also "HIRSCH") is a New York resident, with the office addresses: 375 Park Ave, Ste 2509, New York, NY 10152. HIRSCH has been providing his address also at: 1333A North Ave #716, New Rochelle, NY 10804.  Certain databases provide also his third address: 4 Bradford Road, Scarsdale, NY 10583-7601.      HIRSCH has been the operator of the website www.watchnetwork.com, acting under the umbrella of at least two corporations.  As relevant in this action, HIRSCH knowingly published defamatory information on Plaintiffs, particularly DAVIDOFF, provided to HIRSCH by his associates, acting under the corporate name of MIT in New York.  HIRSCH published that information, on information and belief, not for free, but obtaining financial benefit from MIT. When HIRSCH was approached on behalf of Plaintiffs with the request to delete the defamatory information, HIRSCH refused to delete it, continuing to defame the victimized businessman, DAVIDOFF, which is described more in detail below.  Moreover, HIRSCH refused to delete such defamatory publication despite receiving a copy of the Complaint in the related action Docket #12cv6969 (PAE).  That led to a conclusion that HIRSCH had personal stake in continuing to keep the defamatory information published.

5.      Defendant WATCHNETWORK (associated with owning and managing the website www.watchnetwork.com) is an unincorporated association operating in New York, claiming a substantial presence on the Internet in the area of selling luxury watches on the Internet.  WATCHNETWORK is dominated by, and connected with, its operator HIRSCH.  WATCHNETWORK is associated with the same three addresses in New York as HIRSCH: 375 Park Ave, Ste 2509, New York, NY 10152; 1333A North Ave #716 New Rochelle, NY, 10804, and 4 Bradford Road, Scarsdale, NY 10583-7601.  Plaintiffs' requests addressed through HIRSCH, to cooperate in removing the search references to

the prima facie defamatory webpages, were denied by HIRSH acting on behalf of WATCHNETWORK.

6.      Defendant MMI DISTRIBUTION, INC. (hereinafter also "MMI") is a New York corporation, with offices enumerated above, associated with HIRSH: 375 Park Ave, Ste 2509, New York, NY 10152; 1333A North Ave #716 New Rochelle, NY 10804, and 4 Bradford Road, Scarsdale, NY 10583-7601.  MMI is set up, on information and belief, to process payments made by customers of WATCHNETWORK.  MMI, as DOS ID #3685059 shows, was registered in the State of New York on June 16, 2008, with registered agent: National Registered Agents, Inc., 111 8th Ave, New York, NY, 10011, posting HIRSCH as its chairman and chief executive officer, at 1333A North Ave #716, New Rochelle, NY, 10804.  Operating through WATCHNETWORK and HIRSCH, MMI has been used for the defamatory campaign against DAVIDOFF, effecting KALIMANTANO and FELDE.   Acting in conjunction with HIRSCH and WATCHNETWORK, MMI ignored Plaintiffs' requests to cooperate in removing the prima facie defamatory information from the website at issue.

7.      Defendant GMT DISTRIBUTION, INC. (hereinafter also "GMT") is a New York corporation, with offices enumerated above, associated with HIRSH: 375 Park Ave, Ste 2509, New York, NY 10152; 1333A North Ave #716, New Rochelle, NY 10804, and 4 Bradford Road, Scarsdale, NY 10583-7601. GMT was registered in the State of New York, under DOS ID #2668191 on August 7, 2001, as a foreign corporation (Delaware). Its address is c/o Michael Marchant, Davis & Gilberg LLP, 1740 Broadway, New York, NY, 10019.  Its chairman and chief executive officer is HIRSCH.  The operating address is indicated as 375 Park Ave., Ste 2509, New York, NY, 10152, with no registered agent.  GMT is set up, on information and belief, to process payments made

by customers of WATCHNETWORK.   Operating through WATCHNETWORK and HIRSCH, GMT has been used for the defamatory campaign against DAVIDOFF, effecting KALIMANTANO and FELDE.   Acting in conjunction with HIRSCH and WATCHNETWORK, GMT ignored Plaintiffs' requests to cooperate in removing the prima facie defamatory information from the website at issue.

8.      Defendant TWITTER, INC. (hereinafter also "TWITTER") is a corporation under the laws of State of California, with offices in New York at the address: 340 Madison Avenue, New York, NY.   TWITTER is the leading social media corporation specializing in short text messaging among its subscribers, grouped by interests.   In practice, TWITTER text messages become widely published on the Internet. TWITTER ignored Plaintiffs' requests to cooperate in removing from its web texting records, searchable on the Internet, the references to the prima facie defamatory concerning Plaintiffs.

9.      The issues in this lawsuit are intertwined with a lawsuit by the same three Plaintiffs, plus one more party, Johannes Schwegler, against five defendants, based on the same or similar set of facts, while seeking other remedies against other parties.   As mentioned above, that matter is styled *Kalimantano et al. v. Motion in Time Inc. et al.*, Docket 12cv6969(PAE), pending in the U.S. District Court for the Southern District of New York, pending since September of 2012.

10.     The following parties, defendants in the above case, Docket 12cv6969, brought under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961 *et seq.* that are non-parties in this matter, are enumerated hereinafter, too.

11.     Non-party Motion in Time, Inc. (as mentioned above also "MIT") is a corporation registered in the State of New York, at the address: 56 West 47 Street, New

York, NY, 10036, which also stands for its shop's location.  It was incorporated on January 24, 2004, #2998638, at the above address, with no registered agent.  MIT is in the retail business of selling, buying and reselling jewelry and expensive watches, both at its shop at the above address and through its website: www.motionintime.com.  MIT has also been regularly using for its sales direct e-mail advertisements and direct proposals to sell certain items, circulated both as solicited and unsolicited e-mails.  On information and belief, MIT has been connected businesswise with HIRSH and WATCHNETWORK.

12.     Non-party EDDIE SHAMAYEV, aka Edward Shamayev, aka Eduard Shamayev, aka Eddie Shamay (hereinafter "SHAMAYEV") is a principal and founder of MIT, and he is either a salesperson at his shifts therein.  On information and belief, SHAMAYEV is an immigrant, originally from Tajikistan (one of the Republics of the former USSR).  SHAMAYEV resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  SHAMAYEV has also been doing business under at least two corporate names, neither of which is in good standing in New York, but which he occasionally used for his business purposes.  On information and belief, SHAMAYEV has been connected businesswise with HIRSH and WATCHNETWORK.

13.     Non-party MICHAEL SHAMAYEV, aka Mikhail Shamayev, aka Mihail Shamayev, aka Mikhail Shamay (hereinafter "MICHAEL") is SHAMAYEV's brother and one of the principals of MIT, also working at its store as a salesperson.  MICHAEL also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  MICHAEL has been linked to another address: Forrest Hills 105-21, 66 Avenue, New York, NY, 11375.  MICHAEL, inter alia, obtained in Frankfurt, Germany, on false pretenses, €143,000 in cash, while selling and handing over a

defective item, a watch.  While subsequently facing the demand of returning the item and of the refund, MICHAEL engaged, with others, in the extortionist campaign, using the Internet means, seeking to coerce Plaintiffs to abandon their lawful claims.   On information and belief, MICHAEL has been connected businesswise with HIRSH and WATCHNETWORK.

14.     Non-party BORIS SHAMAYEV, aka Boris Shamay (hereinafter "BORIS") is SHAMAYEV's son and one of MIT's principals, on information and belief, also working at its store as a salesperson.  BORIS also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036. BORIS was the person who initiated various e-mails that constituted wire frauds and made a number of phone calls from New York, targeting Plaintiffs.  BORIS likewise engaged in a conspiracy with the other Defendants, to pursue extortionist activities, including using the Internet means, as described herein.

15.     Non-party DAVID SHAMAYEV, aka David Shamay (hereinafter "DAVID") is SHAMAYEV's other son, who is also one of MIT's principals, also working at its store as a salesperson.  DAVID also resides in New York, with the address: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  DAVID was the person who construed various defamatory websites, targeting Plaintiffs, and engaging, in a conspiracy with the others, in extortionist activities, for purposes of retaining the moneys obtained on false pretenses.

## II. JURISDICTION.

16.     This Court has jurisdiction because of the diversity of citizenship pursuant to 28 U.S.C. §1332.   For purposes of jurisdiction, one Plaintiff is incorporated in

Germany and two other Plaintiffs are citizens and residents of the Federal Republic of Germany.  They have never resided in the USA nor have visited the U.S. to date.

17.     For purposes of the diversity of citizenship, all five Defendants are subject to general jurisdiction of the State of New York, because they maintain permanent offices within the District of Columbia and do business in this jurisdiction.  Their location for purposes of this action is different from Plaintiffs' location overseas.

18.     There is thus a complete diversity of citizenship here.  The amount in controversy, exclusive of interest and costs, is in excess of the statutory minimum of $75,000.

19.     Jurisdiction of this Court is proper in light of the question of the federal law in this action, i.e. the claims asserted against Defendants herewith pursuant to the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125.

20.     Jurisdiction of this Court and venue are proper because it may grant and enforce relief of preliminary and of permanent injunction sought in this action against HIRSCH and other Defendants herein with their offices in the State of New York.

### III.  UNDERLYING FACTS.

A.  Circumstances of False Allegations against Plaintiffs.

21.     The family of the immigrants from Tajikistan, one of the Republics of the former Soviet Union, the SHAMAYEVS, has been in the business of selling, buying and reselling jewelry in the State of New York, for almost two decades.

22.     SHAMAYEVS' initial customers were primarily also immigrants from the former USSR, and therefore their business/trading name in use was AmRus Jewelry, Ltd. (American-Russian Jewelry).   Later SHAMAYEVS expanded and diversified their

8

clientele beyond the Russian-speaking immigrants' community in New York. SHAMAYEVS also started doing sales to buyers in other States and internationally.

23.     The SHAMAYEVS' family worked, at all relevant times, at the jewelry store, whose main staff consisted, on information and belief, of SHAMAYEV, his brother MICHAEL, as well as SHAMAYEV's sons BORIS and DAVID.

24.     In or about 2006, the SHAMAYEVS opened a store at the prime location in Manhattan, at 56 W 47th Street, New York, NY, 10036, in the so called 'diamonds district', in proximity of numerous other jewelry shops, boutiques, and businesses.

25.     In addition to selling, buying and reselling jewelry, the SHAMAYEVS also have been offering the watches' repairs.  Increasingly, they were also selling watches of expensive brands.  Selling watches has been becoming the SHAMAYEVS' prime occupation over the years.  After the incorporation of MIT in 2006, their business went mostly under that new trading name, used as a logo on their shop.

26.     The SHAMAYEVS extended their retail business, operated out of their shop, by offering watches and jewelry online, through their website, as mentioned above, www.motionintime.com.  On information and belief, the SHAMAYEVS obtained or bought from different sources the lists of e-mails of potential buyers and customers and undertook the direct mailing of their offers by circular e-mails.  The usual e-mails offered very big discounts (up to 65%) on watches, such as Cartier, Rolex, Patek Philippe, Chopard, Perrelet, Hublot, Omega, Breguet, Roger Dubuis, et al.

27.     On information and belief, neither the SHAMAYEVS, nor the corporations associated with them, MIT and two other corporations, currently dissolved, have ever been authorized to act as retailers of any of those luxury brands of watches. Despite the apparent lack of permissions or certification, MIT's circular e-mails, offering

particular watches produced in limited series, were designed in a manner that was to draw an inference that MIT was an authorized retailer for those brands and producers.

28.     SHAMAYEV and others from his family associated with MIT's store, as enumerated above, have been subject to a number of lawsuits in the Supreme Court of New York, in Manhattan, and other courts in the State of New York.  Some of the lawsuits were associated with their three corporations, i.e. MIT and two dissolved entities.

29.     One of those who were receiving the direct marketing and promotional e-mails from MIT, including announcements of 'blowout sales' of watches, was a German businessman, DAVIDOFF.  Since about 2009, DAVIDOFF was periodically receiving MIT's e-mails offering very unusual discounts on the watches of the luxury brands such as Cartier, Patek Philippe, Chopard, Perrelet, Hublot, Roger Dubuis, et al.

30.     As mentioned above, many of those e-mails sent by SHAMAYEVS contained promotional messages: "Blowout Price!!!!", etc.  On information and belief, those promotional e-mails were misleading.  Namely, the watches offered through e-mails were not for real, either being not new, or after repairs, or simply unavailable when an order would be placed, whereas alternatives would be offered instead.

31.     In December of 2011, DAVIDOFF was approached by his trading counterparts in Kazakhstan, asking him to assist them in locating good deals on luxurious watches.  DAVIDOFF was unlucky to recall about those promotional e-mails with offers from MIT and SHAMAYEVS and got back to them.

        (B) Defendants' Fraud of Selling a Defective Item for Cash in Frankfurt.

32.     In December of 2011, DAVIDOFF, acting in the interests of his trading counterparts in Kazakhstan, arranged for the purchase of an expensive watch of the Swiss

brand 'Patek Philippe', model 5970, offered to him by the SHAMAYEVS through MIT's e-mails.

33.     Relying on the representations made by SHAMAYEV, MICHAEL and BORIS, DAVIDOFF arranged for the trip to Frankfurt, Germany, of his customers from Kazakhstan, Nurgali Dossanbayev (hereinafter "Dossanbayev"), Ruslan Azizov (hereinafter "Azizov") and Spiro Mantidi (hereinafter "Mantidi").

34.     The SHAMAYEVS and MIT, on the one hand, and DAVIDOFF, on the other hand, agreed that MICHAEL would also fly from New York to Frankfurt, Germany, to bring the offered watch, to meet with the end customers and to consummate the sale.

35.     MICHAEL asked for, and obtained from KALIMANTANO a refund for buying his round trip flight from New York to Frankfurt, Germany, based upon his presentations that he would bring for sale the certified item in an immaculate condition.

36.     On January 4, 2012, at about 10 A.M., DAVIDOFF met MICHAEL at the airport in Frankfurt and brought him to Hilton Hotel in Frankfurt (at the address Hoch Strasse 4), Room 426, reserved and paid for by KALIMANTANO.  See Exhibit D.

37.     Also on January 4, 2012, later in the same morning, DAVIDOFF's associate FELDE met at the airport three incoming customers from Kazakhstan, namely Dossanbayev, Azizov and Mantidi.  FELDE also brought them to the same Hilton Hotel.

38.     At first joint meeting in the lobby of the hotel, MICHAEL met with DAVIDOFF, FELDE, and three incoming customers from Kazakhstan who just arrived from the airport.  MICHAEL then demonstrated to them the watch, Patek Philippe, model 5970, and demanded from the buyers "to show the money".

39.     The customers, Dossanbayev, Azizov and Mantidi, asked MICHAEL to explain what he meant by that because, obviously, nobody carried cash in such amounts. Furthermore, MICHAEL never made that proposition to require cash at any time before he met with the customers at the hotel.  The incoming customers offered to pay from a bank account to MIT's bank account.  MICHAEL thus, unexpectedly, declined to sell that watch, Patek Philippe, that he showed, other than for cash.

40.     Having discussed that unexpected situation, Dossanbayev, Azizov and Mantidi made phone calls to Kazakhstan, making the arrangements for an urgent availability of the cash on two bank accounts, in the name of Dossanbayev and Azizov. The arrangement was made that they could use those two accounts in their names for withdrawing cash from the branches of Commerzbank and from ATM machines in Frankfurt.

41.     Upon their telephone calls to their associates back in their home country, the money was thus promptly made available on their two accounts at BTA Bank in Kazakhstan, for cash withdrawals in Germany.

42.     Experiencing great inconvenience and losing on bank fees for the ATM transactions, normally limiting a withdrawal by €2,000 at a time, Dossanbayev and Azizov were compelled to visit a number of branches and use ATMs in Frankfurt, in order to promptly withdraw the necessary money in Euros.

43.     Plaintiffs have the full banking records from BTA Bank that prove all those transactions and withdrawals of cash by Dossanbayev and Azizov.  Those banking records show the cash withdrawals, with the precision up to a minute, including the address of the bank branch or of the ATM machines.

44.     Upon withdrawing the necessary money in cash, the visitors returned to the Hilton hotel to meet with MICHAEL, again, and complete the purchase of the item that MICHAEL had shown.  The price was €143,000, calculated to match $175,000 at the exchange rate of the day.

45.     DAVIDOFF and FELDE accompanied Dossanbayev and Azizov to the room, where MICHAEL was staying, Room No. 426.

46.     MICHAEL then counted the tendered cash in Euros, in the presence of four persons: DAVIDOFF, FELDE, as well as the foreign buyers, Dossanbayev and Azizov.

47.     Upon physically counting, by hand, €143,000 (in the Euros) in his room, MICHAEL confirmed that the amount tendered in cash was correct, and then passed the watch, Patek Philippe, 5970, in a box.  MICHAEL assured that the watch was new, certified and in an impeccable condition.  MICHAEL also paid a commission of €8,000 to DAVIDOFF as an intermediary for that sale, for connecting him to the ultimate buyers and organizing the meeting.

48.     After that purchase was consummated, DAVIDOFF invited all the participants to the restaurant called 'The Ivory Club' at Taunusanlage 15, D-60325, in Frankfurt.  The participants at the dinner included DAVIDOFF, his wife, MICHAEL, and Azizov.  They all dined from about 7 P.M. to 11 P.M., in a very friendly mood.  At no time did MICHAEL express any allegations against DAVIDOFF at the dinner or at any time in Germany.

//

//

(C) Circumstances of Emerging False Pretenses of "Stealing"

49.     On the next day, January 5, 2012, DAVIDOFF discussed with MICHAEL making two more purchases from him.  One order was for one more watch 'Patek Philippe' 5970, and another for Audemars Piguet Montoya watches (500 pieces).

50.     Against MIT's invoices showing those items, DAVIDOFF made on that day two wire transfers for the advance prepayment on those items, for $50,000 and $70,000, in two separate wire transfers to MIT's account at Bank of America, from KALIMANTANO's account at Commerzbank in Frankfurt.  The balance was to be paid by KALIMANTANO upon the actual delivery of the ordered items from MIT, eventually again to Frankfurt.

51.     In the morning of January 6, 2012, MICHAEL took the return plane to New York.  MICHAEL had at his disposal €135,000 in cash after the sale of the watch.

52.     On information and belief, MICHAEL carried that cash totaling €135,000 received from the customers on the eve, to the plane.  On information and belief, MICHAEL failed to report that money in the U.S. Customs and Border Protection form (6059B Form), question #13, at the time of the reentry of the U.S. border.

53.     Later in January of 2012, DAVIDOFF repeatedly contacted MIT and the SHAMAEVS, asking for his new orders, for which he had wire-transferred the advance payment, ready to pay the balance.  Each time, he got an explanation from the SHAMAYEVS and MIT that his two new orders were not yet ready for delivery.

(D) Smearing Campaign Posted through Defendants Used for Extortionist Threats.

54.     Unexpectedly to DAVIDOFF, FELDE and KALIMANTANO, the customers and buyers, Dossanbayev and Azizov, contacted them from Kazakhstan and

advised that the Patek Philippe watch, model 5970, that they had purchased from MICHAEL, was actually a used item.  They complained that the manufacturer's seal was not intact nor a genuine one.

55.     Those customers advised DAVIDOFF that, having developed suspicions, they had shown the watch for inspection at one of the authorized retailers' shop.  The watch's identification number was traced.  It was determined that that watch was not a new one and was produced by Patek Philippe back in 2010.  Because the production seal was not genuine, even although craftily replicated, the presumption was that that watch had been repaired.

56.     The customers in Kazakhstan, the buyers of that watch, demanded to return the watch, Patek Philippe, 5970, back to MIT and to return the funds that they paid in Frankfurt.

57.     DAVIDOFF and KALIMANTANO immediately turned over that matter to SHAMAYEVS, asking for the explanations and demanded to return the questionable watch and to refund the moneys paid for it.

58.     SHAMAYEV, MICHAEL and BORIS vaguely denied that the watch was not new and repaired, but failed to provide the documentary proof that the item in question was certified as new.  They declined to accept that watch back and to return the money MICHAEL received for it in Frankfurt.

59.     Furthermore, SHAMAYEV, MICHAEL and BORIS, completely changing their story, started to claim, fraudulently, that MIT's account at Bank of America was never credited with $120,000 towards the new purchase of the items ordered by DAVIDOF and KALIMANTANO on January 5, 2012.  However, the wire transfers' funds were never returned back to KALIMANTANO through the banking channels.

60.     DAVIDOFF's telephonic inquiries from MIT were met with an ever growing irritation and aggressiveness on the part of the SHAMAYEVS, who started to falsely accuse DAVIDOFF and MIT of various frauds, all without any substance.

(E) Shamayevs' Threats to Plaintiffs as a Part of Campaign to Destroy.

61.     Furthermore, the SHAMAYEVS started to make threats to DAVIDOFF, stating that his safety would be in jeopardy, unless DAVIDOFF dropped the refunds' matter and unless he and KALIMANTANO wrote off all the losses caused by MIT.

62.     Those repeated threats by the SHAMAYEVS to DAVIDOFF culminated in SHAMAYEV's phone call to DAVIDOFF that was made on June 14, 2012 at 11:59 P.M. local time in Germany, i.e. 5:59 PM EST in New York.  As the phone records show, that conversation, initiated by SHAMAYEV, lasted 11 minutes.  In that phone call that SHAMAYEV initiated from his phone in New York, knowing that it was already night-time in Germany, SHAMAYEV made threats and shouted vulgar obscenities, with the most menacing tonality and implications.

63.     Specifically, SHAMAYEV threatened DAVIDOFF that he would physically harm DAVIDOFF and his family, that he would destroy them.  Furthermore, SHAMAYEV also said that he could contract murdering DAVIDOFF.  SHAMAYEV also engaged in a litany of vulgar obscenities addressed to DAVIDOFF and his family.

64.     On the next day, June 15, 2012, at 9:51 A.M. in Germany, DAVIDOFF wrote back to SHAMAYEV an e-mail, to memorialize that conversation, namely that SHAMAYEV had made insults, threats to him and to his family.

65.     On June 18, 2012, KALIMANTANO and DAVIDOFF lodged with the Attorney General of Hessen Province (Land) in Germany, with main offices in Frankfurt, the criminal complaint against the SHAMAYEVS.

66.     The Attorney General's Office of Hessen Province opened the criminal inquiry against the SHAMAYEVS, including against BORIS, which was confirmed by the letter to KALIMANTANO of June 29, 2012, docket No. 8208.

(F) Defendants' Facilitating Defamation Campaign against Plaintiffs

67.     In response to the initiation of the criminal proceedings in Germany, the SHAMAYEVS caused a most denigrating campaign launched against DAVIDOFF on the Internet.

68.     SHAMAYEVS purchased from Godaddy LLC a website domain, www.tofikdavidoff.com, creating a website with the headlines "Tofik Davidoff: A Man You Can't Trust".  On that website, the SHAMAYEVS posted a so called "Stolen Watch Alert".  They falsely accused DAVIDOFF as though he had "stolen" the watch, Patek Philippe, Ref. No. 5970P-001, Serial No. 3931765/4500264.  That was the same watch that DAVIDOFF had helped MIT sell to the customer in Kazakhstan and then attempted to have returned and moneys paid refunded, once the watch was determined to be defective.

69.     That website was maliciously created, according to the website records, by DAVID, who essentially hijacked another person's identity, to create a defamatory website in DAVIDOFF's name.

70.     Likewise, the SHAMAYEVS, carrying out their threats to destroy DAVIDOFF and KALIMANTO by all possible means, started to post the same or similar messages and "alerts" on numerous websites.

71.     Those defamatory webpages and the illegal website became prominent on searches on the names of DAVIDOFF and KALIMANTANO, based on the search results of GOOGLE, FACEBOOK and MICROSOFT.

72.     Since June of 2012, upon any searches on those names, such defamatory webpages essentially eclipsed any other web information on DAVIDOFF and KALIMANTANO.

73.     Repeating the litany of their false accusations, those webpages and the illegal website claimed as though DAVIDOFF had "stolen" that watch. No details were provided in any of those defamatory messages, but those made it appear as though DAVIDOFF walked into MIT's store and allegedly "stole" that watch. In fact, DAVIDOFF never even visited that store in New York.

74.     Acting with an unspeakable malice and ruse, the SHAMAYEVS also copied DAVIDOFF's pictures on certain websites and posted those together with the alerts brandishing his name as that of a thief who, according to their false claims, had stolen a watch from MIT.

75.     In a particular instance, the SHAMAYEVS also obtained from some sources an image of DAVIDOFF's passport as the citizen of Germany and posted DAVIDOFF's passport's image on the defamatory webpages.

76.     All those defamatory postings by the SHAMAYEVS, attacking DAVIDOFF, were patently fraudulent and false, unspeakable and extreme in their offensiveness, brazen in their claims and in their use of the Internet capabilities, calculated to destroy the reputation of their target.

77.     As a result of that malicious defamatory campaign orchestrated and staged by the SHAMAYEVS, KALIMANTANO's business incurred very substantial damages. Its reputation in Germany was smeared, and numerous customers either avoided buying from KALIMANTANO, or curtailed their accounts.

78.     Likewise, DAVIDOFF's personal reputation was suddenly very seriously damaged.  Anyone making a simple search on the Internet on DAVIDOFF's name could see MIT's highly offensive postings on at least dozen web portals or websites, falsely calling DAVIDOFF 'a thief', who had allegedly 'stolen a watch', the Patek Philippe, 5970, presumably from the MIT store.

79.     In fact, such false allegations were made against the background that DAVIDOFF, again, never even visited MIT's store in New York and met with nobody from MIT other than once with MICHAEL in Frankfurt, when MICHAEL sold that watch to the foreign customers, for cash.   In order to ascertain all the relevant circumstances, MICHAEL never made any allegations or made any statements to the German law enforcement neither in the course of his trip to Germany on January 4-5, 2012, where this would have been required, nor, on information and belief, at any other times to date.

80.     SHAMAYEVS were fully aware that their brazen and malicious accusations of DAVIDOFF that they caused being highly aggressively posted on the Internet, were patently false and a product of pure fabrication.

81.     The SHAMAYEVS' objective was to discourage DAVIDOFF and KALIMONTANO from pursuing the lawful means to recover from SHAMAYEVS the moneys actually paid, towit $120,000 and €135,000, and returning to them their defective watch Patek Philippe, fraudulently sold as new and certified item, which it was not.

82.     In light of the lawsuit *Kalimantano et al. v. Motion in Time et.* mentioned above, most of the websites' operators promptly deleted defamatory information posted by SHAMAYEVS, upon requests from Plaintiffs.  There was just one and only case of a flat refusal, described hereinafter.

G) Defamatory Campaign Reflected by Defendants on the Internet

83.     As mentioned above, HIRSH and other Defendants here have been maintaining a website www.watchnetwork.com, that can be accessed through a number of search engines.

84.     That Internet shop for watches was created for selling watches and not for publishing defamatory information on the buyers, who have not bought items from it.

85.     It was improper for HIRSCH and other Defendants to maintain the clearly defamatory publication on their website that, upon its glance, appeared to be used for maligning the person under that name, DAVIDOFF.

86.     Specifically, in about June of 2012, WATCHNETWORK published, based on SHAMAYEVS's input, this information:

"tofik davidoff 5970P beware by motionintime, Views:692   Post Reply

Dear Friends and Watch Enthusiasts,

We are posting this for others not to get defrauded and to beware!!

It is unfortunate for us to have to report that we have been a victim of Wire Fraud.

* * * * STOLEN WATCH ALERT * * * *

Mr. Tofik Davidoff purchased a Patek Philippe 5970P with serial numbers 3931765/4500264 from us in January 2012. He committed wire fraud and the banks only realized this after the watch was already delivered

SCAMMERS Information:

Name: TOFIK DAVIDOFF

Company: KALIMANTANO GmbH

Address: Fleisch- & Feinkosthandel Louisenstraße 98 Bad Homburg, Germany 61348, Phone Number: +49 162 280 58 58, +49 6172 27968-0

PLEASE BE ADVISED THAT IF YOU ARE SHOWN THIS WATCH IT IS STOLEN.

WATCH INFORMATION:

Brand: Patek Philippe,

Reference No. 5970P-001

Serial No. 3931765/4500264

We have informed the Local Authorities as well as the FBI as this is NOT the first time Mr. Tofik Davidoff has committed these crimes. He has swindled at least a dozen people, five of which we are aware of.

WE HAVE INFORMED PATEK PHILIPPE HEADQUARTERS THAT THIS WATCH IS STOLEN AND ALL DEALERS AND BOUTIQUES ARE TO CALL THE AUTHORITIES IF IT IS PRESENTED.

We please ask that if this watch is brought to you for any reason to please contact us:

Motion In Time, Inc. attn: Boris Shamayev

56 West 47 Street

New York, NY 10036

Office: +1 212-302-1678

Mobile: +1 646-879-3038

Fax: +1 212-302-3373

To prevent anyone else from being scammed or defrauded again, we have attached a copy of Mr. Tofik Davidoff's Passport to this link.

Mr. Davidoff has all the proper papers for the watch so the deal might look legitimate if he offers to sell the watch, however, he was only able to obtain the

watch along with the papers because of his fraudulent wire payment. - HE HAS THE WATCH, BOX, PAPERS AND 2nd CASE BACK.

We appreciate your assistance in this matter.

Stolen Watch!! Please be on the look out!! Reward if found!!

Re:tofik davidoff 5970P beware by motionintime.

87.    To make the effect of the offensive and defamatory information even worse, WATCHNETWORK's webpage has been subject to promotional enhancement.  It did not simply just contain the defamatory webpage, but also providing a snapshot summary on 2-3 lines, which enhanced the defamatory information, on Google, Bing and other search engines.  As the count shows, published on the web page, it has been accessed 692 times (as of January 13, 2013).

88.    On December 20, 2012, Plaintiffs' representative approached HIRSH and WATCHNETWORK by telephone, explaining the problem and asking to cooperate in deleting the information.   The person, taking the phone calls on behalf of WATCHNETWORK, on information and belief, HIRSH, gave his e-mail address to confirm the request, as follows: dh@watchnetwork.com.

89.    On December 21, 2012, Plaintiffs' representative confirmed the request in writing, annexing, for information, the copies in the Complaints, cited above.

90.    On December 22, 2012, HIRSH refused to cooperate, sending back the following message: "I was curious and read the case file.  This read more like a screenplay than a case.  Unbelievable.  However, there were many questions and it was not so clear who might be right or wrong and is just an accusation.  Based on this, there is no legal reason to remove the posting. We are discussing it after the holidays as we don't really want to be involved with people of this nature. Daniel."

22

91.     Markedly, at no time did HIRSH, writing as "Daniel", did disclose his actual last name and the corporate affiliations, under which WATCHNETWORK was published.  All that information had to be obtained through private investigatory efforts.

92.     By way of a context, nearly all other websites, that had posted SHAMAYEVS' "alert" message, had already voluntarily deleted the false and defamatory webpages attacking DAVIDOFF.

93.     HIRSCH and WATCHNETWORK became actually the only web-based business that refused to cooperate.  On information and belief, the explanation thereto could be none other than that they were connected to MIT and SHAMAYEVS businesswise, and thus insisted on assisting them even risking being sued.

94.     As a result of HIRSCH's and WATCHNETWORK's posture and refusal, the damage to DAVIDOFF and KALIMANTANO became perpetuated.

95.     HIRSH's and WATCHNETOWRK's conduct resulted in several contracts that DAVIDOFF and KALIMANTANO had being disrupted.  The counterparts for the contracts with KALIMANTANO, refusing to pursue the ongoing contracts and withdrawing from those, cited the defamatory link maintained by WATCHNETWORK, as a reason not to go through the contracts.

96.     In a particular instance, in December of 2012 the counterparts to KALIMANTANO, located in France, having received monies from KALIMANTANO towards a certain purchase of merchandise, actually refused to promptly fulfill the order and declared they would be holding the monies for "security".

97.     KALIMANTANO was damaged in that and in other instances, caused by Defendants' having caused irreparable harm to the reputation of KALIMANTANO and its president DAVIDOFF, which resulted in declining sales and loss of business.

### COUNT I. RELIEF UNDER THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT, 15 U.S.C. § 1125
#### (Kalimantano and Davidoff against All Defendants)

98.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 97 above, as if restated herewith with the same force and effect.

99.     As mentioned above, HIRSH and other Defendants here, engaged in the business of providing, in exchange for a fee, Internet-based website advertisements.

100.    As mentioned above, HIRSCH and other Defendants have operated and Internet store, at the domain: www.watchnetwork.com, on which the posted false information about the prominent business person, DAVIDOFF and consequently effecting his business, KALIMANTANO.

101.    That conduct continued and the website was preserved despite the various protestations on behalf of DAVIDOFF, asking to remove that defamatory page from the website.  It was also clear from the website's contents that it was unauthorized and pursued unlawful aims.

102.    The operators of a website, posting information of offensive nature, such as HIRSCH and other Defendants here, are liable for injunctive or monetary relief in the case of bad faith or reckless disregard.

103.    Plaintiffs are entitled to relief under the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125, to the full extent of the applicable law.

### COUNT II.  DEFAMATION.
#### (All Plaintiffs against All Defendants)

104.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 97 above, as if restated herewith with the same force and effect.

105.    Shortly after Plaintiffs first claimed the proceeds to be refunded back to Plaintiffs and the watch Patek Philippe, 5970 be returned, the SHAMAYEVS the defamation campaign against KALIMANTANO and DAVIDOFF and made clear that they would make KALIMANTANO and DAVIDOFF regret dearly if they would pursue those claims.

106.    In fact, Defendants effectively carried out their threats, making the increasingly offensive statements concerning DAVIDOFF and KALIMANTANO to third parties, both orally by telephone and in writing, whereby using the highly offensive and false statements on the Internet, using the Internet facilities controlled by Defendants.

107.    In particular, Defendants assisted or at least allowed the SHAMAYEVS to circulate and publish using the Internet for the attention of third parties the false accusations against DAVIDOFF and KALIMANTANO, as though KALIMANTANO's president DAVIDOFF was a 'thief', fraud, dishonest, and unreliable for the counterparts.

108.    After KALIMANTANO and DAVIDOFF lodged a criminal complaint against the perpetrators before the Attorney General's Office for Hessen Province in Germany, the SHAMAYEVS drastically intensified their complaint for the purpose of defaming DAVIDOFF.   Among other lines of attacks, Defendants assisted to the SHAMAYEVS in publishing the false information as though DAVIDOFF had allegedly 'stole' the watch 'Patek Philippe', 5970.

109.    The contents of the defamatory webpage on the website of WATCHNETWORK, cited above pro verbatim, is incorporated herewith by reference.

110.    In fact, Defendants' statements in the Internet, including through WATCHNETWORK, essentially operated to hijack someone's identity for making patently untrue statements.   Defendants pursued their agenda to defame Plaintiffs,

25

depriving them of their good faith reputation and discouraging their clients and customers from dealing with KALIMANTANO and DAVIDOFF.

111.    As mentioned above, DAVID, relying on the assistance or contrivance of the Defendants herewith, was instrumental in creating a defamatory posting on WATCHNETWORK, essentially engaging in the Internet defamation for the extortionist purposes.

112.    That malicious campaign, made possible by Defendants' facilities on the Internet, had in fact a very negative effect on KALIMANTANO's and DAVIDOFF's business, which was very much dependent upon their public image and reputation.

113.    As to TWITTER, it also maintained defamatory information, concerning "theft" of which MIT accused DAVIDOFF, maintaining it without any lawful reason.

114.    Plaintiffs are entitled to relief under the count 'defamation'.

## COUNT III.  INTERFERENCE WITH BENEFICIAL BUSINESS RELATIONSHIP.
### (All Plaintiffs against All Defendants)

115.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 97.

116.    As the facts above show, Defendants allowed the publication on the Internet of a number of written statements, attacking KALIMANTANO and DAVIDOFF, smearing them through the use of the Internet.

117.    As cited above, the publication on the Internet accused KALIMANTANO and DAVIDOFF as though they were dishonest, that DAVIDOFF allegedly 'stole' the certain watch, which MICHAEL actually sold to KALIMANTANO's customers and received the payment in cash for that.  FELDE, as a part of KALIMANTANO's management team, was also damaged.

118.    The result of such assistance of Defendants to the vicious and malicious attacks of the SHAMAYEVS was to defame KALIMANTANO and DAVIDOFF and to damage their business reputation.

119.    Consequently, the damage to Plaintiffs' reputation, given the turnover of their business in Germany, and the effect of diverting their customers and counterparts, could be assessed at over $200,000.

120.    Plaintiffs are entitled to relief for interference into the beneficial business relationship.

### COUNT IV.  INVASION OF PRIVACY.
### (Davidoff against All Defendants, Except Twitter)

121.    Plaintiff DAVIDOFF incorporates by reference the allegations in Paragraphs 1 to 97 above, as if restated herewith with the same force and effect.

122.    As the facts above show, Defendants allowed the SHAMAYEVS to undertake a malicious campaign of defaming DAVIDOFF and KALIMANTANO on the Internet, in particular accusing DAVIDOFF as though he had 'stolen' the watch in question, Patek Philippe, 5970.   Among other things, DAVIDOFF's picture from his passport was posted on the Internet, with Defendants' reckless ignoring the illegality of such a publication.

123.    The deliberately aggressive campaign, staged by SHAMAEVS, with the assistance of Defendants, smeared the reputation of DAVIDOFF and of KALIMANTANO.  That included the use of a fraudulently created web page and other means, at a minimum DAVIDOFF should be entitled to damages for intrusion of privacy.

124.    That disclosure was public; the private facts, such as those in DAVIDOFF's passport, were disclosed; the matter publicized was highly offensive to

reasonable person.  The matters reflecting SHAMAYEVS' attacks on DAVIDOFF were not legitimate concern to public.  Such disclosure of private facts and false light invasion of privacy occurred through Defendants', using their enormous impact upon the Internet, giving the publicity to the matter in question.

125.    DAVIDOFF is entitled to relief for invasion of privacy.

### COUNT V.  INJUNCTIVE RELIEF.
### (All Plaintiffs against All Defendants, Except Twitter)

126.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 97 above, as if restated herewith with the same force and effect.

127.    As shown above, relying on the reckless lack of control over the suspect publications on the part of Defendants, the SHAMAYEVS engaged in posting on the Internet various fraudulent attacks on DAVIDOFF and KALIMANTANO, claiming as though DAVIDOFF had 'stolen' their watch 'Patek Philippe', 5970.

128.    As mentioned above, this was an outright lie.  DAVIDOFF never visited MIT's store in New York, nor ever visited the USA.  When MICHAEL visited Frankfurt, requiring upfront the full refund of the air tickets from New York, he brought with him to the watch in question.  MICHAEL sold that item for cash, in the amount of €135,000, which he counted in his hotel room No. 426, Hilton Hotel in Frankfurt, in the presence of four (4) witnesses.

129.    Defendants should be ordered to immediately delete SHAMAYEVS' false, malicious and virulently fraudulent attacks on DAVIDOFF and KALIMANTANO. Defendants should also be ordered to withdraw or deactivate all their postings on the Internet that they undertook after about June 15, 2012.

130.    Defendants should also be ordered to delete the defamatory webpage that they, created for causing ongoing damage to the reputation of Plaintiffs.  Defendants should be prohibited from such conduct concerning DAVIDOFF and KALIMANTANO in the future.

131.    Plaintiffs are entitled to relief under the count of injunctive relief.

## PRAYERS FOR RELIEF

THEREFORE, Plaintiffs request this honorable Court to grant relief as follows:

1)      To order HIRSH, WATCHNETWORK, MMI and GMT, without limitation, to dismantle, and/or deactivate, and/or delete the defamatory website page on the wbsite: http://www.watchnetwork.com, dedicated to defaming DAVIDOFF and, consequently, its employer KALIMANTANO;

2)      To order Defendants to delete all defamatory and false messages posted by the SHAMAYEVS and MIT on Defendants' Internet facilities;

3)      To order Defendants (except for TWITTER) to delete the image of DAVIDOFF's picture fraudulently taken from his passport;

4)      To award damages against Defendants to the full extent of the applicable law, requested to be $200,000 or more;

5)      To award attorneys' fees and costs;

6)      To grant such other and further relief as the Court deems proper.

Respectfully submitted:

Dated: January 18, 2013

/s/_____

GEORGE LAMBERT (D.C. Bar No. 979327),
LAW OFFICES OF LEONARD SUCHANEK
Subject to application for pro hac vice admission
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com

/s/_____

PETER A. JOSEPH, Esq.
Bar PJ-9723
177 Waverly Place # 5F
New York, NY, 10014-3552
Tel. (212) 924 1498

Attorneys for Plaintiffs